George P. Phillip, Appellee, v. The First National Bank of Chicago, Appellant.

Gen. No. 39,814.

Heard in the second division of this court for the first district at the October term, 1937. Opinion filed December 13, 1938.

AMBERG, OTT, DAHLIN & LIVINGSTON and NAT M. KAHN, of Chicago, for appellant; NAT M. KAHN and FRANK L. PAUL, of Chicago, of counsel.

CAMPBELL, CLITHERO & FISCHER, of Chicago, for appellee.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

George P. Phillip, as trustee, plaintiff herein, brought suit against the First National Bank of Chicago, defendant, for breach of contract in charging his accounts with checks that were not signed as required by the agreement, thereby causing plaintiff a loss. The case was tried by the court without a jury, resulting in findings and judgment in favor of plaintiff for $5,170 and costs, from which defendant appeals.

There is substantially no dispute as to the facts, but a summary thereof is necessary for a proper understanding of the questions of law involved. George P. Phillip, formerly an officer of the Phillip State Bank, was a banker of more than 20 years' experience. In 1932 he was appointed as successor trustee under four trust deeds which secured real estate mortgage bond issues originally negotiated and sold by the Garfield Park State Bank. Phillip, as trustee, was placed in possession of the real estate secured by these trust deeds, which consisted of apartment buildings, but he had nothing to do with managing the properties and his custodianship was purely nominal since the owners of the equities remained in possession, collected the rents themselves, and remitted the proceeds to the bondholders' committee of the Garfield Park State Bank, which maintained an office at 8 South Dearborn street, Chicago. One Thomas R. Ferguson, a friend of Mr. Phillip, who was a member of the bondholders' committee and had previously been associated with Phillip in the bank, and Luke J. Malley, were employed by the bondholders' committee at regular salaries and had charge of the office. Mr. Phillip would drop in occasionally, but his name was not on the door.

In March, 1932, plaintiff, through his attorney, Herman A. Fischer, opened two separate checking accounts with the First National Bank, under the respective names of "George P. Phillip—Montenegro Properties" and "George P. Phillip—Forte Properties," and at the same time Mr. Fischer delivered the following letters, addressed to defendant bank: "Kindly pay all checks drawn on the account of George P. Phillip—Montenegro Properties when signed by any one of the following: George P. Phillip—T. R. Ferguson—Luke J. Malley—and countersigned by any one of the following: Louis S. Binkley—Herman A. Fischer—Dated at Chicago, Illinois, March 25, 1932. (Signed) Herman

A. Fischer, Counsel for George P. Phillip and above properties.'' A similar letter was delivered to the bank and signed by Mr. Fischer in relation to the account under the name of ''George P. Phillip—Forte Property.'' On the same day signature cards were delivered to the bank for each of these accounts. After the name of the account and on a separate line on the top portion of the card appears the legend ''Two Signatures Necessary,'' and underneath and following this phrase are the following five signatures and words: ''George P. Phillip—Will Sign; Luke J. Malley—Will Sign; T. R. Ferguson—Will Sign; Herman A. Fischer —Countersign; Louis S. Binkley—Countersign.'' The back of each signature card contains plaintiff's address as Room 805—8 South Dearborn street. It appears from the evidence that at least ten accounts, similar in nature, were opened by plaintiff with defendant bank. The Forte and Montenegro accounts were opened March 25, 1932, as heretofore stated, and were closed June 14, 1935.

The suit at bar is predicated upon 33 checks which did not have the signature or countersignature of either Herman A. Fischer or Louis S. Binkley, aggregating $4,700. Of this amount, checks for a total of $4,130 were payable to the order of Ferguson and $570 to the order of Malley. Of these checks, $1,050 were signed alone by Phillip, the owner of the account, $300 by Phillip and Malley, $200 by Phillip and Ferguson, and $3,150 by Malley and Ferguson.

It appears that Phillip exercised no supervision whatsoever over these checking accounts, other than signing certain checks, at times countersigning other checks and frequently signing or countersigning checks in blank at the request of Ferguson or Malley. Whenever he signed or countersigned checks in blank, Phillip would make no separate record as to the identity of the checks, nor did he take the precaution to make an

entry on the stubs covering checks thus signed by him in blank. Even as to those checks upon which no complaint is made, which Phillip signed or countersigned, did he require any showing to be made by either Ferguson or Malley as to the propriety of the checks or the purpose for which they were intended, and in at least three instances Phillip cashed checks made payable to his order which were signed in the same manner as those upon which he brought suit.

It further appears from the evidence that Phillip never saw any of the bills for the upkeep of the properties, nor approved any of them for payment. A ledger or book of account was kept under the supervision of Malley or Ferguson at the office of the bondholders' committee, but Phillip never examined this ledger, and upon the trial he testified that he did not even then know who had charge of authorizing the payment of the bills for the upkeep of the property, nor did he have any idea as to whom the checks were made payable. Phillip kept no record whatsoever in connection with the properties; he confined his activities to the signing of checks when he dropped in at the office. His visits to the office of the bondholders' committee were rather infrequent, and at times when traveling he would be absent for long periods. He was unable to say or even approximate the number of checks that he signed or countersigned in blank, and admitted that he never turned down any request by Malley or Ferguson to sign or countersign checks in blank when requested so to do. At the time of the hearing he was not even certain whether he was still the trustee.

From a stipulation entered into between the parties it appears that during the time the accounts were maintained in the defendant bank the canceled checks and bank statements thereof were mailed each month to Mr. Phillip at the office of the bondholders' committee, 8 South Dearborn street, which was later moved to

10 South LaSalle street, Chicago. None of the canceled checks was ever destroyed, but they were filed away in a cabinet together with the statements accompanying them and were found so filed by Mr. Fischer in April or May, 1935. All the statements had the following notice printed thereon: "Please examine at once, if no errors are reported within ten days the account will be considered correct." Phillip testified that this was a customary notice on bank statements with which he was familiar because of his experience as a banker; that at no time during the entire period of more than 3 years that the accounts were in the defendant bank did he ever examine or even look at the bank statements and canceled checks, nor did he ever delegate anyone to make such an examination. In fact the inspection of these canceled checks and bank accounts was never discussed between Phillip and Fischer until more than 3 years had elapsed after the accounts were opened, when Fischer found the canceled checks still enclosed in their original bank statements at the office of the bondholders' committee. Phillip had no recollection of ever having seen the canceled checks and bank statements nor did he ever inquire about them, and as he himself testified, "I did not bother at all with them." Phillip said that he had full confidence in Ferguson and Malley, that Malley was covered by a fidelity bond and that the bondholders' committee was looking after matters.

Plaintiff contends that defendant bank is liable for the 33 checks upon which suit was brought because none of them was countersigned by either Fischer or Binkley. As said heretofore, $4,130 of these checks were made payable to Ferguson and $570 to Malley. Of the 33 checks 2 were signed by Phillip alone and 11 aggregating $1,400 bore Phillip's signature. The remaining 20 checks aggregating $3,150 were signed by both Malley and Ferguson.

The record discloses that altogether there were 841 checks drawn on these accounts from the time they were opened March 25, 1932, until they were closed. The earliest date of any check upon which suit was brought is January 20, 1934, almost 2 years after the account was opened. Previous to the last date 281 checks had been drawn and paid in the Montenegro account. Of these 281 checks there were 11 drawn and paid which had the same signatures as the checks upon which suit was brought. The first 10 of these checks were all countersigned by Phillip, the eleventh was signed by Phillip alone, payable to his own order and cashed by him. This check was for $150 and represented payment of his trustee's fees on account. Included in these 11 checks, none of which bore the signatures of either Fischer or Binkley, was one for $326.55, payable to the bondholders' committee.

In the Forte account 293 checks were drawn and paid prior to January 20, 1934. Of these 293 checks 11 were countersigned by Phillip. Among them was a check for $416.91 payable to the bondholders' committee, and another for $200 payable to Phillip, indorsed by him and cashed in defendant bank. None of these 11 checks had the signatures of either Fischer or Binkley.

Defendant's counsel summarize the checks drawn on both accounts up to January 20, 1934, and they show that there was a total of 574 checks drawn, of which 22 or an average of one out of every 26 checks did not contain the signatures of either Fischer or Binkley, covering a period of approximately 22 months from March 25, 1932, to January 20, 1934. After January 20, 1934, 54 checks were drawn on the Forte account, which in addition to the 8 Forte checks upon which suit was brought, aggregate 62 checks. Summarizing all the checks drawn after January 20, 1934, counsel point out that there were a total of 264 checks drawn against

both accounts. Of these 33 constitute the basis of this suit, and in addition there were 38 checks, including 27 drawn on the Montenegro account, without the signatures of either Fischer or Binkley, and 11 on the Forte account without either of their signatures, making a total of 71 checks in all drawn on both accounts which did not contain the signatures of either Fischer or Binkley. Of the 38 checks drawn on both accounts which are not included in the 33 upon which suit was brought, none bore the signatures of either Binkley or Fischer, and 20 had the countersignature of Mr. Phillip. Four of these 20 checks were signed by Phillip, including a check for $3,173.92, one of the largest checks drawn on either account, payable to Thomas D. Nash, county collector, and six others which did not include the signature of either Fischer or Binkley, all payable to the bondholders' committee, aggregated $1,667.89.

When Mr. Fischer learned in May, 1935, that Ferguson and Malley had cashed checks drawn on the accounts, payable to their own order, he visited the office of the bondholders' committee, and for the first time examined the canceled checks and bank statements. Thereafter this suit was instituted.

It is urged by defendant at the outset that Phillip, as trustee, had complete legal title to the rents which constituted the funds upon which these various checks were drawn, and plaintiff in his brief concedes that as between him and the defendant bank plaintiff was the sole owner of these accounts, notwithstanding he was acting as a trustee and had a legal duty to others who were the beneficiaries of the trust. Being the owner of the funds in these accounts, it is difficult to understand why defendant should not have been given credit at least for those checks upon which suit was brought, bearing the signature of Phillip. There were a total of $1,550 of such checks; $1,050 of this sum was for

checks signed by Phillip alone, $300 for checks signed by Phillip and Malley, and $200 for checks signed by Phillip and Ferguson. Some of the checks signed by Phillip alone were payable to his own order for trustee's fees, were indorsed by him and cashed at the bank the same day they were issued. Phillip did not bring suit on the checks payable to his own order and signed by him, but he did institute suit on the $1,550 worth of checks signed by him which were payable to Malley and Ferguson, and we see no distinction between checks signed by Phillip alone, payable to himself, and those signed by him alone payable to Ferguson or Malley. When he placed his name on the checks on which he brought suit, he did so on his own responsibility, and if he was the owner of the funds upon which the checks were drawn, as plaintiff concedes, it would seem that the bank became relieved of any responsibility in the matter as against Phillip.

Counsel on both sides concede that under the general rule, even if a depositor omits all examination of his statement and canceled checks, the bank is still liable for wrongfully paying the checks drawn on his account, where it appears that the bank was negligent in paying them, but defendant contends that this rule, while general in its application, has its limitations and does not apply to the facts at bar, because plaintiff was grossly negligent in the maintenance of his books and records and exercised no supervision whatsoever over his accounts, and because plaintiff not only had full knowledge that checks were improperly drawn, but by actually participating in the drawing of a series of checks in a manner similar to the checks upon which suit was brought ratified the practice and became estopped from holding the bank liable.

Plaintiff relies principally on the early case of *Manufacturers' Nat. Bank v. Barnes,* 65 Ill. 69. In that case plaintiff, expecting to be absent for a short time, gave his clerk and bookkeeper a power of attorney to draw

checks on the defendant against deposits for 15 days
only, and deposited the power of attorney with the
bank. After his return and the expiration of 15 days,
the clerk continued to draw checks without the knowl-
edge of plaintiff, part of which he applied to the pay-
ment of the firm's bills and the balance of which he
appropriated to his own use. The court held that de-
fendant was liable for the moneys paid out on the
checks after the clerk's agency had ceased. The deci-
sion was based on an early New York case, *Weisser
v. Denison,* 10 N. Y. 68, where under similar circum-
stances the court had held the bank guilty of negligence,
notwithstanding the fact that the depositor had failed
to examine the returned checks. Examination of the
following authorities, however, discloses that this early
rule is no longer followed, either in this State or New
York.

In Brady on Bank Checks, 2nd Ed., p. 289, the author
points out decisions in ''a few of the earlier cases,''
holding that a depositor is under no obligation to ex-
amine the bank statements or paid checks which are
returned to him, and cites *Manufacturers' Nat. Bank
v. Barnes, supra,* as one of the few earlier cases to
which reference is made, but says that ''now it is quite
well established that a depositor is under a duty to
examine the bank's statements and his canceled vouch-
ers with reasonable promptness and to report to the
bank any forgeries, alterations or other irregulari-
ties.''

The doctrine laid down on *Weisser v. Denison,* 10
N. Y. 68, which was decided in 1854, has been rejected
by the courts of New York in recent years. It was
held by the court of appeals of New York, in *Morgan
v. United States Mortgage & Trust Co.,* 208 N. Y. 218,
that a depositor who sends his pass book to be writ-
ten up and receives it back with his paid checks as
vouchers is bound, under certain circumstances, to
examine the pass book and vouchers and to report to

the bank, without unreasonable delay, any errors which may be discovered. And again in *Potts & Co. v. Lafayette Nat. Bank,* 269 N. Y. 181, the court of appeals of that State held that the depositor owed to the bank a positive duty to examine the monthly statements of its accounts, and was not excused by the fact that it intrusted that duty to a dishonest employee.

In this State the Supreme Court has likewise departed from the rule laid down in *Manufacturers' Nat. Bank v. Barnes.* In the recent case of *Cosmopolitan State Bank v. Lake Shore Trust & Sav. Bank,* 343 Ill. 347, decided in 1931, the court held that "A depositor of a bank who receives from it a statement of his account with its paid checks as vouchers is bound to examine the account and vouchers and report to the bank, without unreasonable delay, any errors which may be discovered," citing *Morgan v. United States Mortgage & Trust Co.,* 208 N. Y. 218; *Prudential Ins. Co. of America v. National Bank of Commerce,* 227 N. Y. 510; *Dana v. National Bank,* 132 Mass. 156; *Leather Manufacturers' Nat. Bank v. Morgan,* 117 U. S. 96. In the last mentioned case it was held that a depositor in a bank who sends his pass book to be written up and receives it back with entries of credits and debits and his paid checks as vouchers for the latter, is bound personally or by an authorized agent, and with due diligence, to examine the pass book and vouchers and to report to the bank, without unreasonable delay, any errors which may be discovered in them; and if he fails to do so, and if the bank is thereby misled to its prejudice, he cannot afterward dispute the correctness of the balance shown by the pass book.

In *Osborn v. Corn Exchange Nat. Bank,* 218 Ill. App. 28, this court had occasion to consider a similar question, and in discussing *Morgan v. United States Mortgage & Trust Co.,* 208 N. Y. 218, one of the cases cited, said "this case overruled *Weisser v. Denison,* 10 N. Y. 68."

In discussing the duty of a depositor to examine his statements and canceled checks, the writer of an article appearing in 24 Columbia Law Review 467, calls attention to the rule in *Weisser v. Denison,* holding that a depositor is under no duty to examine his statement and canceled checks, characterizes that decision as *dictum* which has been quoted occasionally in other States, and concludes by saying, "but the contrary view has been definitely adopted by the New York Court of Appeals, and is now generally accepted," citing *Critten v. Chemical Bank,* 171 N. Y. 219.

In *Empire Trust Co. v. Cahan,* 274 U. S. 473, an adult son exceeded the authority given him by his father under an unlimited power of attorney and drew funds from the bank which he applied to his own use. These transactions went on for over two years. The father had no knowledge that this son was misappropriating money and no notice other than that given by the form of the checks. In reversing the judgment of the district court and circuit court of appeals in favor of plaintiff, the Supreme Court of the United States called attention to the fact that the transactions had gone on for over two years and that the bank might fairly expect plaintiff to "find out in a month or two if anything was wrong. Careful people generally look over their bank accounts rather frequently." The facts in this case disclose that Phillip was not only careless, but by reason of his experience as a banker was fully cognizant of his duty to check his statements and canceled checks. The record discloses an utter disregard of this duty imposed upon him by law as well as by agreement of the parties, and because of the knowledge that must be imputed to him of the alleged wrongful payments extending over a long period of time, in which he actually participated, it would be unconscionable to permit him to recover. Among the decisions cited by plaintiff we find no case in which recovery was permitted where the depositor had notice

or knowledge of the improper payments and failed to voice objection. The circumstances of this case are stronger than any of the reported decisions that have been called to our attention by reason of the fact that Phillip not only had notice and disregarded the plain duty imposed upon him by law as well as by agreement of the parties, but he also actively participated in violating his own instructions.

There is, however, an additional reason among the many urged by defendant's counsel why plaintiff should not be permitted to prevail in this proceeding. He was the sole owner of these funds and could distribute them as he saw fit insofar as the bank was concerned, and was at liberty with the consent of the bank to change and modify his original instructions as to the mode of payment. The question therefore arises whether by his course of conduct over a long period of time he is not estopped from denying that he authorized the bank to make payments in a different manner than that embodied in his original instructions to the bank. The earliest date of the checks upon which suit was brought was January 20, 1934. Prior to that time some 22 checks had been drawn against the accounts which did not bear the countersignature of either Binkley or Fischer and no objection was made to this practice. These 22 checks were signed in the identical manner of those on which suit is brought and counsel refers to them as ''ratification,'' or ''estoppel'' checks. This evidently constituted the first departure from Phillip's original instructions to the bank. After January 20, 1934, this changed or modified method of payment continued with increasing frequency. Thereafter, there were some 71 checks drawn against the accounts which did not bear the signature or countersignature of either Binkley or Fischer, including the checks upon which suit was brought. Many of these checks were· for large amounts, one being for $3,173.92, payable to

the county collector. This check bore the signature of Malley and the countersignature of Ferguson, identical with most of the checks upon which suit was brought. Phillip made further departures from the original instructions issued to the bank in signing, alone, numerous checks payable to his own order and using the proceeds in payment of trustees' fees on account. All these ratification or estoppel checks, as defendant's counsel call them, were regularly returned to Phillip each month with a bank statement which imposed upon him the duty of examining them and stating that if no errors were reported within 10 days the account would be considered correct. Neverthless, no complaint was ever made, and in fact Phillip admitted that neither he nor anyone on his behalf had ever as much as looked at the bank statements or canceled checks for a period of approximately three years. It was not until Phillip's counsel found these canceled checks and bank statements in the files in Phillip's office, just as they had been returned by the bank, that suit was instituted. It seems to us that this constituted a course of dealing on the part of Phillip, amounting to ratification or consent to the payment of checks in accordance with his own practices, and placed the responsibility on his own shoulders. It was through his own negligence that the checks in suit were paid and he ought to be estopped from holding the bank liable for doing that which he repeatedly sanctioned.

Courts in various jurisdictions have absolved banks from liability under circumstances not nearly so aggravated as the facts in this case. In *Newmark Grain Co. v. Merchants Nat. Bank of Los Angeles,* 166 Cal. 203, 135 Pac. 958, the officers of a depositor by their conduct permitted a bookkeeper to cash checks over a period of 3 years. Under the original arrangements between the depositor and the bank checks were to be cashed only by some one authorized to sign checks for

the firm and the bookkeeper was not included in these instructions. The bank was held not liable because the bookkeeper had been permitted to cash checks over a long period of time, and this conduct was held to estop the depositor from holding the bank liable for the checks improperly cashed.

In *Thorold Mfg. Co. v. Imperial Bank,* 13 Ont. 330, the president and treasurer of the depositor were the only persons authorized to cash checks in the original written instructions filed with the bank. However, the secretary of the company was in the habit of cashing checks and his continued conduct in so doing, *with the knowledge of the depositor,* was held to estop the latter from questioning this custom because it had failed to object thereto.

In *Bank of Ukiah v. Mohr,* 130 Cal. 268, 62 Pac. 511, the Supreme Court of California held that the depositor was estopped from questioning the payments of drafts drawn against its account signed by an allegedly unauthorized agent, *because the depositor knew of previous, similar drafts, drawn by the same agent and paid by the bank, to which he had failed to object.*

In Mitchie on Banks and Banking, 1932, vol. 5, p. 337, sec. 178, the rule is stated as follows: "Where a depositor by negligent silence or silent acquiescence estops himself from denying the authority of an agent to draw checks against his deposit, the estoppel applies as to subsequent deposits in the absence of evidence of a notification to the bank that they should be treated differently from the first in respect to their withdrawal. *A course of dealing between the bank and a depositor may establish obligations as to its continuance, and if nothing is provided to the contrary, will govern subsequent transactions of the same nature between them.*" (Italics ours.)

A conclusion in conformance with this rule was reached in *Reeves v. First Nat. Bank of Oakland,* 20

Cal. App. 508, 129 Pac. 800, wherein a departure was made from the original signature instructions given to the bank, and the court held that since all the other checks drawn on the account were signed the same way as the two checks upon which suit was brought, the conduct of the parties showed "how the parties had interpreted the contract, and this course of conduct may be regarded as having established a general usage between the bank and the plaintiff. . . ."

In view of the unusual facts of this case and the decisions cited to support our conclusions, we are impelled to find that Phillip should be estopped from holding the bank liable for a departure from instructions which he by his own conduct had led the bank to believe was acceptable to him.

The judgment of the circuit court is reversed.

*Judgment reversed.*

JOHN J. SULLIVAN and BURKE, JJ., concur.